UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 15-23807-MARTINEZ/GOODMAN

SCOTT A. KRON, individually and on
behalf of all others similarly situated,

      Plaintiff,

vs.

GRAND BAHAMA CRUISE LINE, LLC,
a Florida Limited Liability Company,

      Defendant.

_____/

## DECLARATION OF BRIAN M. TORRES

      I, Brian M. Torres, an adult under no legal disability, pursuant to 28 U.S.C. § 1746, declare:

      1.      I am an attorney of record and counsel for Plaintiff Scott A. Kron.

      2.      I am submitting this Affidavit in support of Plaintiff's Scott A. Kron's Motion for Class Certification in the above-styled matter. For the following reasons, I am qualified to provide adequate representation to the Plaintiffs, and to the putative plaintiff class, and thus to serve as lead counsel in this matter.

      3.      By way of background, I am an attorney who has been duly licensed to practice law in the State of Florida continuously since 1994, and I am in good standing with the Florida Bar. My Florida Bar number is 036498. I am also admitted to practice and in good standing in the U.S. Court of Appeals for the 9th and 11th Circuits, as well as in the District Courts for the Southern and Middle Districts of Florida.

      4.      Before my admission to the Florida Bar in 1994, I graduated from law school at the University of California at Berkeley, Boalt Hall School of Law (J.D. 1994), where I was also an associate editor from 1992 to 1994 of the school's flagship law journal, the *California Law Review*. Prior to law school, I graduated *magna cum laude* from Williams College, in Williamstown, Massachusetts with B.A. in history in 1991.

      5.      I am the co-author with Scott D. Sheftall, Esq. (now at Sheftall & Associates, P.A.,

Jacksonville, Florida) of Chapter 12, "Expert Witnesses," and Chapter 20, "Orders and Judgments", of the 6th and 7th editions of Florida Civil Trial Practice, Fla. Bar (Lexis-Nexis, 2001 and 2005).

6.      I have been the managing shareholder of Brian M. Torres, P.A., in Miami, Florida, since February 1, 2016. Previously, I was a founding partner in September 1996 of Sheftall Alvarez & Torres, P.A., in Miami, Florida, and practiced continuously with the firm, which later became Sheftall & Torres, P.A., through January 31, 2016. I first appeared in this case in March 2016 for the Plaintiff.

7.      Since the beginning of my career in 1994, I have practiced law primarily in the area of business litigation, including in complex commercial litigation in U.S. District Courts and Florida state courts. I have served as trial counsel in more than 200 civil litigation cases during my career. I have also appeared as appellate counsel in several dozen cases throughout my career, and I have briefed and argued over 20 cases as lead appellate counsel in Florida District Courts of Appeal.

8.      I first became involved in class action litigation in 1994 at the outset of my career while I was an associate at Kurzban Kurzban & Weinger, P.A., in Miami, Florida. At the Kurzban firm, I worked under the supervision of Ira Kurzban, Esq., in our representation of the Haitian Refugee Center, Inc., in multi-party class action litigation against the United States Government. The litigation arose out of alleged violations by the Government of the U.S. Constitution and U.S. immigration laws in its handling of both Cuban and Haitian migrants seeking to cross the Florida Straits in 1994 to the U.S., including the disparate treatment afforded Cuban and Haitian migrants. *See Cuban Amer. Bar Ass'n et al. v. Warren Christopher, Secretary of State, et al.*, 43 F.3d 1412 (11th Cir. 1995).

9.      Subsequent to co-founding Sheftall Alvarez & Torres, P.A., in 1996, class action litigation became the predominant part of my law practice during the next eight to ten years. Much of my time during that period was spent in class action litigation against auto insurers doing business in the State of Florida.

10.     Specifically, I was directly involved in the representation of classes of insureds and medical providers in litigation seeking to recover damages for Florida auto-insurers' failure to pay timely Personal Injury Protection (PIP) benefits. My firm was appointed lead class counsel in over half of the 45-50 cases that Scott Sheftall initially filed in 1995 while he was a partner at Floyd

Pearson Richman Greer et al. in Miami (now known as Richman Greer). The first such case to be certified as a class action and affirmed on appeal was *Colonial Penn Ins. Co. v. Magnetic Imaging Sys. I, Ltd.*, 694 So. 2d 852 (Fla. 3d DCA 1997) ("The trial court found that Magnetic and its qualified lawyers would be adequate representatives, and the record clearly supports this finding.").

11.     While litigating the PIP class action cases, Scott Sheftall and I achieved certification of a plaintiff class in arbitration, as well as a $2.7 million award to the class in arbitration. We believed this to be the first time in Florida that a plaintiff class had been certified and an award entered on a class-wide basis in arbitration. While the insurer in the case initially successfully moved to compel arbitration of the plaintiff's claim, it later failed to obtain a stay of the same arbitration from the arbitration panel, the Circuit Court in Broward County, and from the Fourth District Court of Appeal. *Fortune Ins. Co. v. U.S.A. Diagnostics, Inc.*, 736 So. 2d 1279 (Fla. 4th DCA 1999). Subsequently, the arbitration panel, which included former Florida Supreme Court Chief Justice Arthur England and former Florida Third District Court of Appeal Judge Dan Pearson, certified the class and entered a class-wide arbitration award. Shortly after the Circuit Court confirmed the award, however, the defendant insurer went into liquidation under the auspices of the Florida Department of Insurance, and the case was effectively ended.

12.     During the course of the PIP class action litigation project, I first had the opportunity to work with my current co-counsel, John G. Crabtree, Esq., then of Crabtree & Associates, P.A. Mr. Crabtree served as lead appellate counsel for the plaintiff in *Magnetic Imaging Sys. I, Ltd. v. Prudential Prop. & Cas. Ins. Co.*, 847 So. 2d 987 (Fla. 3d DCA 2003). After winning on appeal a reversal of a judgment against the plaintiff, the *Prudential* case settled on a class-wide basis with my firm (Sheftall & Torres, P.A.) and I appointed as lead class counsel.

13.     In addition to the foregoing, I also worked as plaintiff's counsel while at Sheftall & Torres, P.A., with Searcy Denney Scarola Barnhart & Shipley, P.A., in West Palm Beach, Florida on several class action cases that concerned auto insurer's specification of inferior and potentially dangerous non-Original Equipment Manufacturer (non-OEM) parts in auto repairs. Those cases resulted in one national settlement against Colonial Penn Insurance Co., which was approved by the U.S. District Court for the Southern District of Florida. Searcy Denney and my firm were appointed as class counsel in that case.

14.     Recently, my firm and I were appointed as co-class counsel in a certified class action in the Complex Business Litigation Division of Miami-Dade Circuit Court: *Solaris at Brickell Bay*

*Condo. Ass'n, Inc. v. LM Funding, LLC*, 2014-CA-20043 (Fla. 11th Cir.). That class action involves allegations of violations of Florida's usury law, RICO violations, and Deceptive and Unfair Trade Practices claims against a self-proclaimed financial services company on behalf of a state-wide class of hundreds of condominium associations. The class obtained loans from the financial services company that resulted in the class members paying allegedly usurious rates of interest under Florida law. A copy of the order certifying the Florida state court class is attached as Exhibit A.

15.     I am familiar with the fiduciary nature of the responsibilities of class counsel to the the plaintiff class under the Federal Rules of Civil Procedure, including with respect to settlement or compromise of alleged or certified class claims. If appointed as class counsel by this Court, I will act at all times with the best interests of the class in mind and will not place my personal interests or those of the Plaintiff ahead of absentee class members.

16.     On behalf of my law firm, I am aware that litigation expenses in this matter could reach $100,000 or more. My firm has the resources and access to capital to be able to fund the portion of those projected expenses that have been allocated by agreement among our co-counsel to my firm.

I, Brian M. Torres, hereby declare under penalty of perjury under the laws of the United States of America that the foregoing statements are true and correct.

Executed on this 1st day of September 2017, at Miami, Florida.

Respectfully submitted,


 /s/ Brian M. Torres
BRIAN M. TORRES

# EXHIBIT "A"

IN THE CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY
Case No. 2014-20043-CA-01 (40)
_____

SOLARIS AT BRICKELL BAY
CONDOMINIUM ASSOCIATION,
INC., on behalf of itself and all
others similarly situated,

        Plaintiff,

vs.

LM FUNDING, LLC,

        Defendant.

_____/

LM FUNDING, LLC,

        Counter-Plaintiff,

vs.

SOLARIS AT BRICKELL BAY
CONDOMINIUM ASSOCIATION,
INC.,

        Counter-Defendant.

_____/

**ORDER GRANTING PLAINTIFF'S
<u>MOTION FOR CLASS CERTIFICATION</u>**

    **THIS CAUSE** came before the Court on November 14, 2016 on the Plaintiff's

MOTION FOR CLASS CERTIFICATION ("Plaintiff's Motion"). The Court having

1

heard argument of counsel, reviewed the Plaintiff's Motion, the Defendant's Opposition, and the Plaintiff's Reply, having reviewed the record evidence and the submissions by the parties, and being otherwise fully advised in the premises, GRANTS the motion based on the findings of fact and conclusions of law set forth below:

## INTRODUCTION

### A. General Principles

As an initial matter, the court only determines whether the requirements of Florida Rule of Civil Procedure 1.220 have been met.  Indeed, the Florida Supreme Court has instructed that "[w]hen determining whether to certify a class, a trial court should focus on the prerequisites for class certification and not the merits of a cause of action." *Sosa v. Safeway Premium Fin. Co.*, 73 So. 3d 91, 105 (Fla. 2011).

In certifying a class, the trial court is required to conduct a "rigorous analysis" regarding whether the case is one that meets the criteria set by Florida Rule of Civil Procedure 1.220. *Baptist Hosp. of Miami, Inc. v. Demario*, 661 So.2d 319, 321 (Fla. 3d DCA 1995). "To obtain class certification, the proponent of class certification carries the burden of pleading and proving the elements required under rule 1.220." *Sosa*, 73 So.3d at 106.  However, "[a] trial court should resolve doubts with regard to certification in favor of certification, especially in the early stages of litigation." *Id.* at 105.

## B. Standard for Class Certification

To obtain class certification, a movant is required to satisfy all four elements of Rule 1.220(a) and at least one element of Rule 1.220(b).  If a movant's submission establishes the requirements for a class action, the court must certify the class.

To satisfy Florida Rule of Civil Procedure 1.220(a), the Court must conclude that:

> (1)   The members are so numerous that separate joinder of each member is impracticable ("numerosity");
>
> (2)   The claims of the representative party raise questions of law or fact common to the questions of law or fact raised by the claims of each member of the class ("commonality");
>
> (3)   The claims of the representative party are typical of the claims of each member of the class ("typicality"); and
>
> (4)   The representative party can fairly and adequately protect and represent the interests of each member of the class ("adequacy of representation").

Fla. R. Civ. P. 1.220(a). In addition, the movant must show that its claim can be maintained under at least one of the provisions of Florida Rule of Civil Procedure 1.220(b).

## C. Plaintiff's Claims

The Plaintiff, Solaris at Brickell Bay Condominium Association, Inc., and the putative class it seeks to represent are all condominium or homeowners' associations

that entered into contractual relationships with LM Funding.  Pursuant to their contractual relationship, LM Funding allegedly advanced a sum of money to each class member, but attempted to disguise that alleged loan by calling it a sale of accounts receivable that each association owned. That sum always amounted to a small percentage of the delinquent assessments owed by unit owners to the associations.

In return for advancing this sum, LM Funding obtained the power to receive all of the outstanding delinquent assessments owed by a portfolio of the association's delinquent units and also to retain all the interest and late fees that had accrued (and continued to accrue) on that *entire* portfolio (not merely on a percentage of the portfolio related to LM Funding's initial advance).  Solaris alleges that the accruing interest and late fees constitute LM Funding's return on its initial cash advance.

According to Solaris, LM Funding has taken advantage of statutory law that was meant to protect associations—statutes ensuring associations some minimum amount of recovery on their delinquent assessments—to structure its advances so as to statutorily guarantee their return. And, according to Solaris, by advancing each class member only a small percentage of that class member's total outstanding delinquent assessments and by implementing a waterfall repayment structure for the sums collected—through which any money collected by LMF was credited against a hierarchy of repayment categories, each of which must be satisfied before proceeds

4

may be credited against the next subordinate tier—LM Funding ensured that it would always earn a usurious return on its initial advance.

Solaris further alleges that LM Funding entered into materially similar contracts with the other associations.  It is the material terms of these similar contracts that Solaris argues dictate that each class member will pay LM Funding a similarly usurious rate of return on the statutorily guaranteed advance that it receives from LM Funding. Accordingly, Solaris argues that this case should be determined on a class-wide basis, as most of the questions necessary to resolve this case can be decided on a class-wide basis.

Florida Condominium Association Law

In order to put Solaris' allegations in context, the Court must first briefly address the statutory context within which the plaintiff condominium association makes its allegations. Condominium associations charge maintenance fees—termed assessments—to cover common expenses.  Fla. Stat. § 718.103(1).  If a unit owner does not pay these assessments, the association may impose a lien against the property.  *Id.*  If a unit owner is delinquent in paying the assessments, associations may charge interest on those delinquent assessments (up to a maximum statutory default rate of 18% per annum) and may charge an administrative late fee on each delinquent assessment set at the greater of $25 or 5 percent of each delinquent installment owed by a unit owner.  Fla. Stat. § 718.116(3).

5

Generally, any entity that acquires title to a unit (by purchase or otherwise) becomes jointly and severally liable with the previous owner for all unpaid delinquent assessments.  In other words, when a delinquent unit owner sells a unit on which he or she owes delinquent assessments, that transfer doesn't terminate a condominium association's power to seek payment from the previous owner (and actually opens up a new avenue for recovery: the subsequent owner).

There is, however, one partial exception to this general rule, which protects first mortgagees acquiring title through foreclosure (or a deed in lieu of foreclosure). In such circumstances, the first mortgagees are not jointly and severally liable for the delinquent assessments.  Instead, their liability has been statutorily capped.

The statutory cap is located in Florida Statute section 718.116, which reads as follows:

> The liability of a first mortgagee or its successor or assignees who acquire title to a unit by foreclosure or by deed in lieu of foreclosure for the unpaid assessments that became due before the mortgagee's acquisition of title is limited to the lesser of:
>
> > a. The unit's unpaid common expenses and regular periodic assessments which accrued or came due during the 12 months immediately preceding the acquisition of title and for which payment in full has not been received by the association; or
> >
> > b. One percent of the original mortgage debt.

§ 718.116(b), Fla. Stat.[1]   The cap also functions as a statutory safeguard for condominium associations, which can—thanks to the statute—calculate with certainty the *minimum* sum that they are statutorily guaranteed to recover in a worst case scenario, i.e., a first mortgagee foreclosure.

The statutory safe harbor is such a core component of LM Funding's transaction that within its contract LM Funding expressly states that

> If the date of the Association's Declaration precedes the effective date of Section 718.116, Florida Statutes, or if the Association's Declaration excuses a first mortgage holder taking title through foreclosure from payment of Delinquent Assessments, then in the event a first mortgage holder refuses to pay Delinquent Assessments because of the provisions of Association's Declaration, LM Funding will have the option to return the account to Association pursuant to the terms of Section 7.

Section 7 of the contract, in turn, forces the association to repay LM Funding the advance upon the occurrence of a "Mistake."

<u>Solaris' Allegations</u>

LM Funding's contract with Solaris dictates that LM Funding will advance only a small percentage of the delinquent assessments that the association is entitled to collect on a portfolio of units.  Specifically, that it will not advance more than the "safe harbor" sum, i.e., an amount "not to exceed the lesser of (i) the sum of six (6) months Assessments, or (ii) one percent (1%) of the original principal balance of the

---

[1] Prior to 2010, this amount was the lesser of (a) 1% of the original mortgage debt, or (b) the sum of the assessments that became due in the 6 months preceding the sale.

first mortgage recorded against a Delinquent Unit.").  It is this limitation—and the fact that LM Funding never discretely contracts for individual units, but only a portfolio of units—that, as a matter of basic microeconomics, means LM Funding would *always* and automatically earn a criminally usurious rate (25% or greater) of return on the money that it advanced to each of the class members.

In return for advancing that sum, LM Funding obtained the power to receive all the outstanding delinquent assessments owed by a portfolio of the association's delinquent units and also to retain all the interest and late fees that had accrued (and continued to accrue) on that portfolio.  Pursuant to a waterfall-type repayment structure, any money collected by LMF is credited against a hierarchy of repayment categories—each of which must be satisfied before proceeds may be credited against the next subordinate tier.

According to this waterfall, LM Funding would retain all delinquent assessments owed to Solaris until LM Funding collected an amount equal to the total amount of interest that accrued on *all* of the outstanding delinquent assessments, all late fees that accrued to the associations on the total outstanding delinquent assessments, and LM Funding's total advance to Solaris.  It was only after the associations paid LM Funding funds equal to these amounts that any delinquent assessments could ever be returned to an association.

Given the nominal amount that LM Funding advances to each association relative to the total amount of delinquent assessments that are owed to each association (on a portfolio of each association's units) and that LM Funding gets paid all of the interest on the full portfolio amount (as well as the late fees owed by the delinquent units to each association) the interest that LM Funding receives on its cash advances inherently exceeds the limits of criminal usury (25% per annum).

In addition to utilizing substantially similar contracts with each of the class members, LMF undertook the same business practices with respect to each class member, including directing Business Law Group ("BLG") to act on each class member's behalf and taking action to influence how BLG actually collected the debt at issue.

Based on the above allegations, Solaris alleges on behalf of itself and the class the following causes of action:

Count I: Damages based on LM Funding's violation of the Federal RICO Act, 18 U.S.C. § 1961 *et seq*, and an order enjoining it from further violations.

Count II: Damages based on LM Funding's violation of the Florida Civil Remedies for Criminal Practices Act, section 77.101, Florida Statutes, *et seq*, and an order enjoining it from further violations.

Count III: Damages based on LM Funding's violation of Florida Statutes sections 687.02-04, which states that a contract is civilly usurious if, pursuant to

that contract, a lender willfully charges or receives an effective interest rate that exceeds 18%.

Count IV: Damages based on LM Funding's violation of Florida Statutes section 687.071, which states that a contract is criminally usurious if, pursuant to that contract, a loan has an interest rate of 25% or more.

Count V: Damages based on LM Funding's violation of the Florida Deceptive and Unfair Trade Practices Act, section 501.201, *et seq*, and an order enjoining LM Funding from further violating the act.

Count VI: An order requiring LM Funding to provide a full accounting to each association, including all evidence of money received by LM Funding, costs incurred by LM Funding, invoices prepared by LM Funding, attorneys' fees charged and collected for the benefit of BLG, and all other reasonably related documents and information.

## D. Class Definition

Based on the Court's findings and conclusions set forth herein, the Court certifies the following class:

> All Florida homeowners and condominium associations that entered Class Member Agreements with LM Funding since LM Funding was founded on January 14, 2008, provided (a) that LM Funding has billed or received money pursuant to the contract within the four-year period immediately preceding April 15, 2015; and (b) Business Law Group engaged in collection activity, or otherwise served as counsel for the association.

For purposes of class certification, "Class Member Agreement" is defined as a contract under which:

a) LM Funding advanced a sum of money to the association that did not exceed the safe-harbor amount that the association was statutorily entitled to under Florida Statute Subsection 718.116(1)(b) (for condominium associations) or Florida Statutes Subsection 720.3085(2)(c) (for homeowner associations);

b) In return for advancing that sum, LM Funding received the power to collect all the outstanding delinquent assessments owed by a portfolio of the association's delinquent units and also to retain all interest and late fees that had accrued (and continued to accrue) on that portfolio;

c) Pursuant to a waterfall-type repayment structure, any money collected by LM Funding is to be credited against a hierarchy of repayment categories—each of which must be satisfied before proceeds may be credited against the next subordinate tier;

d) The waterfall repayment structure dictates that LM Funding will retain from any future collections all interest, late fees owed to the associations, and the initial cash advance before the association is entitled to recover any delinquent funds; and

e) LM Funding is explicitly authorized to engage Business Law Group to act on behalf of the association.

Excluded from the class is the defendant, its owners, directors, officers, employees, members, managers, parents, affiliates, and all immediate family relatives of such persons; any association that is already in litigation with LM Funding over the terms of the form Class Member Agreement which choose to proceed with same.

11

## FINDINGS OF FACT

The Court makes the following findings of fact:

1.  It is likely that the potential class members number in the hundreds. Former LM Funding CEO, Frank Silcox, testified under oath that there were at least 325 associations with whom LM Funding had contracts with under LM Fundings "traditional program." The "traditional program" is the program that LM Funding entered into with Solaris, which exhibits the core concepts that Solaris alleges render LM Funding's business model inherently usurious. However, given that LM Funding has not yet produced the full number of relevant contracts, and class membership is premised on the inclusion of certain core terms within a putative class member's contract, the Court concludes, without having to speculate as to the non-produced contracts, that there are at least 57 potential members of the putative class. The contracts produced by LM Funding in this litigation each include the core material terms that are set forth as indelible aspects of the class member definition. In light of this number, the Court concludes that the members of the Plaintiff class are so numerous that separate joinder of each member would be impracticable.

2.  The claims asserted by Solaris on behalf of the class raise common questions of law that predominate over any apparent individual issues. Solaris alleges that LM Funding created a business model through which it would always

12

receive a usurious rate of interest on the amount of money it advanced to each association, and its common course of conduct was set forth in, and dictated by, the material terms of LM Funding's contract entered into with each class member. The material terms of the contract that effectuate that result are explicitly included in the class definition. Given that the claims alleged by Solaris allegedly arise from the uniform terms of the contracts that LM Funding entered into with the class members, LM Funding's liability can be established on a class-wide basis based upon an analysis of those material terms.

3. Solaris' claims against LM Funding are typical of the class. Solaris alleges that LM Funding charged it a usurious rate of interest and employed a business practice that violated both federal and state RICO as well as Florida's Deceptive and Unfair Trade Practices Act. Given that each class member entered into similar contracts with LM Funding that included an enumerated list of material terms, the interpretation of which Solaris alleges will be determinative of liability, they too have suffered the same alleged injury and seek the same redress under the same substantive claims as Solaris.

4. Solaris will provide adequate representation for the class members. Solaris is willing and able to prosecute this matter. Based on the record evidence, including Solaris' affidavit, the Court finds that Solaris is aware of its responsibility as a class representative, is willing to serve as class representative

and to protect the members of the class, understands that they represent the interests of the class and is not acting on its own behalf, and have no personal interest that may conflict with the interest of the other class members.

5. Solaris' chosen counsel will also adequately represent the class. Based upon the affidavits provided by class counsel, the Court concludes that the plaintiff's attorneys are qualified, experienced, and fully capable of conducting the litigation.

6. Class representation is superior to other available methods for the fair and efficient adjudication of the controversy. There are no foreseeable difficulties likely to be encountered in the management of this action. The Plaintiff and the putative class members each have injuries that are redressable through the legal and equitable remedies sought in this action.  Given the sheer number of potential class members that are seeking what amounts to an almost identical remedy against a single defendant, it would be grossly inefficient to force each putative class member to bring their own claim. Moreover, allowing the putative class members to proceed with this class action is the most economically feasible remedy given the potential individual damage recovery for each class member and the high costs associated with prosecuting the claims brought herein.

7. Given the causes of action alleged by Solaris, injunctive relief is paramount in obtaining relief on behalf of the class.

14

## <u>CONCLUSIONS OF LAW</u>

**A.**   <u>The Rule 1.220(a) Prerequisites to Class Certification are Satisfied</u>

Florida Rule of Civil Procedure 1.220(a) provides four prerequisites to class certification, i.e., numerosity, commonality, typicality, and adequate representation. Before addressing these issues, however, the Court will address the threshold issue of standing.

<u>1. Standing</u>

To satisfy the standing requirement for a class action claim, the class representative must illustrate that a case or controversy exists between him or her and the defendant, and that this case or controversy will continue throughout the existence of the litigation.  *Sosa*, 73 So. 3d at 116.  A case or controversy exists if a party alleges an actual or legal injury. An actual injury includes an economic injury for which the relief sought will grant redress.  *Id.* at 117

Here, Solaris has suffered an economic injury, fulfilling the actual injury requirement of standing. Namely, Solaris alleges that LM Funding charged a usurious amount on an initial advance that LM Funding had provided to Solaris, in violation of both federal and state laws.  Standing is satisfied.

2. Numerosity

Rule 1.220(a) (1) provides that before a case may be certified as a class action, the court must conclude that "the members of the class are so numerous that separate joinder of each member is impractical." "Impractical" does not mean impossible, and numerosity is satisfied if it would be difficult to join all the members of the class. *Smith v. Glen Cove Apartments Condo. Master Ass'n, Inc.,* 847 So. 2d 1107, 1110 (Fla. 4th DCA 2003). "No specific number and no precise count are needed to sustain the numerosity requirement." *Sosa,* 73 So. 3d at 114. Generally, a class should have at least 25 members. *Estate of Bobinger v. Deltona Corp.*, 563 So. 2d 739, 743 (Fla. 2d DCA 1990) ("classes as small as 25 have fulfilled the numerosity requirement.").

A movant need not show the exact number of members in the class to satisfy numerosity. *Sosa* 73 So.3d at 114. But there must be a sufficient basis to conclude the class is sufficiently numerous. *See In re Checking Account Overdraft Litig.,* 2012 WL 3265093 (S.D. Fla. 2012) (citation omitted) (movant "must make reasonable estimates with support as to the size of the proposed class.").

Here, the evidence shows that the class members number in the hundreds. Frank Silcox, LM Funding's former CEO, testified under oath that there were at least 325 associations with whom LM Funding had contracts with under LM

16

Funding's "traditional program," which is the program that LM Funding entered into with Solaris and which exhibits the core concepts that Solaris alleges render LM Funding's business model inherently usurious. Moreover, the 57 contracts produced by LM Funding contain the core contractual provisions that Solaris alleges render LM Funding's transactions illegal. Accordingly, given that there are at least 57 class members, the Court concludes that Solaris has satisfied the numerosity requirement.

Additionally, the class—as defined—is sufficiently ascertainable. Each potential class member signed a contract with LM Funding. Their class membership status depends on whether the contract contains the terms included in the class definition. LM Funding has copies of all the contacts. LM Funding cannot seriously dispute that reviewing the contracts (which they possess) will not illustrate which associations are members of the proposed class.

3. Commonality

Rule 1.220(a)(2) requires that the claim asserted by the representative party and the claim applicable to each member of the class raise common questions of law or fact. The primary concern of the commonality requirement is "whether the representative's claim arises from the same practice or course of conduct that gave rise to the remaining claims and whether the claims are based on the same legal theory." *Sosa,* 73 So. 3d at 107 (citation omitted).

17

"The threshold of the commonality requirement is not high [and] mere factual difference[s] between class members does not necessarily preclude satisfaction of the commonality requirement." *Sosa*, 73 So. 3d at 107.  Indeed, the "requirement is met if the questions linking the class members are substantially related to the resolution of the litigation even though the individuals are not identically situated.'" *Morgan v. Coats*, 33 So. 3d 59, 64 (Fla. 2d DCA 2010).

Here, as explained more fully above, the Plaintiff asserts that LM Funding undertook a common lending transaction with each class member.  According to Solaris, each class member was subjected to the same usurious practices and suffered the same injury.

In determining whether Solaris and the class members claims are actionable, the Court will have to address many of the same critical inquiries that apply equally to both Solaris and the class members, including: whether the transaction entered into by LMF and the class members through the form Class Member Agreement constitutes a "loan" or a "sale" under Florida law, whether the structure of the Class Member Agreement is designed to impose interest rates that violate the limits of Florida's civil and criminal usury laws; whether LMF intended to charge a rate of interest or, otherwise, received a rate of interest that violates Florida's usury laws; whether BLG constitutes an "enterprise" within the meaning of the federal and state RICO statutes; whether LMF directly or

18

indirectly participated in the affairs of BLG; and whether charging or accepting interest that exceeds the bounds of Florida usury law constitutes the collection of "unlawful" debt as defined in federal and state RICO law and constitutes an unfair or deceptive trade practice as defined under the Florida Deceptive and Unfair Trade Practices Act.

These common questions all arise from a common course of conduct that LM Funding undertook with each class member and can be answered on a class wide basis.

The existence of this alleged common course of conduct is evidenced by the fact that each association's interaction with LM Funding was governed by a materially similar contract. That makes crystalline that each putative class member's claims arises "from the same practice or course of conduct . . . ." *Sosa,* 73 So. 3d at 107 (citation omitted). Indeed, as the United States District Court for the Southern District of Florida explained, "claims arising from interpretations of a form contract appear to present the classic case for treatment as a class action . . . ." *Leszczynski v. Allianz Ins.*, 176 F.R.D. 659, 672 (S.D. Fla. 1997) (quoting *Indianer v. Franklin Life Ins. Co.*, 113 F.R.D. 595, 607 (S.D. Fla. 1986)).

Accordingly, the Court concludes that commonality is satisfied in that "the representative's claim arises from the same practice or course of conduct that

gave rise to the remaining claims and [those] claims are based on the same legal theory." *Sosa,* 73 So. 3d at 107.

4. Typicality

Rule 1.220(a)(3) requires that the class representative's claim be typical of the claim of each member of the class. This element focuses on the sufficiency of the named plaintiffs and the relationship between their claims and the proposed class claims. *Leibell v. Miami-Dade County*, 84 So. 3d 1078, 1085 (Fla. 3d DCA 2012) (internal citations omitted). "The key inquiry for a trial court when it determines whether a proposed class satisfies the typicality requirement is whether the class representative possesses the same legal interest and has endured the same legal injury as the class members." *Sosa,* 73 So. 3d at 114. The Third District held as follows with respect to typicality:

> All class members seek the same remedy. The representatives' claims and the class members' claims are not antagonistic in any way. The mere presence of factual differences will not defeat typicality.

*Broin v. Philip Morris Companies, Inc.,* 641 So. 2d 888, 892 (Fla. 3d DCA 1994) (internal citations omitted).

Courts have consistently concluded that the typicality prong is satisfied where the putative class member claims are based upon materially similar contracts that they entered into with a common defendant.  Indeed, as stated by a leading class-action treatise, "in class actions based on contractual provisions, the proposed class

representative's claims are generally held to be typical of the class members' claims where all arise out of the same general contract." Newberg on Class Actions § 3:37 (5th ed.); *see also Steinberg v. Nationwide Mut. Ins.*, 224 F.R.D. 67, 75 (E.D. N.Y. 2004) (finding typicality because all of defendant company's contracts were "uniform regarding the provisions pertinent to this litigation").

Here, all the class members entered into materially similar contracts with LM Funding and seek the same remedy in response to the parties' contractual relationship.  Accordingly, the Solaris' claim satisfies the typically requirement.

Solaris alleges that each class member was, at all times, entitled to collect the full amount of the delinquent assessments owed by its respective delinquent units.  Although LM Funding styles its contract as a "purchase," LM Funding never actually obtained any ownership interest in each association's delinquent assessments, and LM Funding's collection efforts have always been undertaken in the class members' names.  Thus, those funds amount to interest.

## 5. Adequacy

To grant class certification, a trial court must determine that the class representative satisfies the adequacy requirement of Rule 1.220(a), i.e., it must find that "the representative party can fairly and adequately protect and represent the interests of each member of the class."  Fla. R. Civ. P. 1.220(a)(4).  "This inquiry serves to uncover conflicts of interest between the presumptive class representative

and the class he or she seeks to represent." *Sosa*, 73 So. 3d at 115.  "A trial court's inquiry concerning whether the adequacy requirement is satisfied contains two prongs. The first prong concerns the qualifications, experience, and ability of class counsel to conduct the litigation. The second prong pertains to whether the class representative's interests are antagonistic to the interests of the class members." *Id.* (internal citations omitted).

Solaris is qualified to serve as class representative.  Solaris has participated in the litigation to date, including participating in a deposition.  While LM Funding has challenged Solaris' ability to adequately represent the class based upon its day-to-day knowledge of the case, as illustrated through deposition testimony, the Court finds that the class representative understands the nature of the claims and is willing to participate and assist counsel in this case. Moreover, the evidence shows that Solaris has also committed itself to the prosecution of its legal claims on a class-wide basis in a manner designed to benefit all class members.

The Plaintiff's attorneys are qualified, experienced, and fully capable of conducting the litigation. Class counsel also have no conflicts of interest which are "antagonistic to the interests of the class members." *Sosa*, 73 So. 3d at 115.  LM Funding's contention that Cole Scott & Kissane and Jose Baloyra have such antagonistic conflicts is without basis.  Each and all of the Plaintiff's attorneys will provide adequate representation.

**B.   The Rule 1.220(b) Prerequisites to Class Certification are Satisfied**

1. 1.220(b)(3) - Predominance

"The predominance requirement is similar to commonality because 'both require that common questions exist,' but the 'predominance requirement is more stringent since common questions must pervade,' rather than merely exist." *Miami Automotive Retail, Inc. v. Baldwin*, 97 So. 3d 846, 855 (Fla. 3d DCA 2012) (quoting *Wyeth, Inc. v. Gottlieb*, 930 So. 2d 635, 639 (Fla. 3d DCA 2006)).   Common questions of fact predominate when the defendant acts toward the class members in a similar or common way.  *Sosa*, 73 So. 3d at 111.

The common issues discussed above predominate over individualized issues. LM Funding entered into a substantially similar contract with each class member. In addition to utilizing similar contracts with each of the putative class members, LM Funding undertook the same business practices with respect to each class member, including directing BLG to act on each class member's behalf and taking action to influence how BLG actually collected that debt.

By proving that the Class Member Agreement required Solaris to pay LM Funding a usurious rate of interest and that BLG constituted a RICO enterprise, the Plaintiff will necessarily prove the case of the other class members who entered into materially similar contracts with LM Funding.  *See Miami Auto. Retail v. Baldwin*, 97 So. 3d 846, 855 (Fla. 3d DCA 2012) ("under Florida Rule of Civil Procedure

23

1.220(b)(3), "the trial court must determine whether the purported class representatives can prove their own individual case and, by doing so, necessarily prove the cases for each of the [class members]").

Moreover, where a case turns on the interpretation of core contractual provisions within a contract entered into by multiple plaintiffs, courts have routinely found that common issues predominate over individualized issues. *See Celebrity Cruises v. Rankin*, 175 So. 3d 359, 362 (Fla. 3d DCA 2015); *Brodeur v. Dale E. Peterson Vacations*, 7 So. 3d 567, 569 (Fla. 1st DCA 2009); *Love v. Gen. Dev. Corp.*, 555 So. 2d 397, 398 (Fla. 3d DCA 1989).

The fact that damage calculations will differ does not undermine predominance. *See Sosa*, 73 So. 3d at 107 ("Individualized damage inquiries will also not preclude class certification."). That is especially true where, like here, "any variance in damage recovery between the class members is calculable by using a systematic formula, strengthening the predominance of the class claims." *Sosa*, 73 So. 3d at 113. Solaris has provided the testimony of its expert, Carlos Samlut, CPA, who has developed a formula that can be used to calculate damages. The Court concludes that Mr. Samlut's proposed formula, and his testimony surrounding its application are sufficient to show that damage calculations can be determined by a systematic formula. Mr. Samlut's formula can be modified to accommodate the slightly varying factual scenarios of the class members.

2.  1.220(b)(3) - Superiority

Under 1.220(b)(3) the movant must also show that "class representation is superior to other available methods for the fair and efficient adjudication of the controversy." Three factors apply: (1) whether a class action would provide the class members with the only economically viable remedy; (2) whether there is a likelihood that the individual claims justify the expense of separate litigation; and (3) whether a class action cause of action is manageable. *Sosa*, 73 So. 3d at 116.

Here, there are no foreseeable difficulties likely to be encountered in the management of this action.  The Plaintiff and the putative class members allegedly suffered a similar injury: each paid LM Funding a usurious rate of interest on a loan extended by LM Funding.  The Plaintiff and the putative class members each have injuries that are redressable through the legal and equitable remedies sought in this action.

Additionally, given the significant number of potential class members that are seeking what amounts to an identical remedy against a single defendant, it would be grossly inefficient to force each putative class member to bring their own claim. Moreover, allowing the putative class members to proceed with this class action is the most economically feasible remedy given the potential individual damage recovery for each class member and the high costs associated with prosecuting the claims brought herein.  Superiority is met.

25

3. 1.220(b)(2) - Injunctive or Declaratory Relief

Under Rule 1.220(b)(2) class certification is appropriate where "the party opposing the class has acted or refused to act on grounds generally applicable to all the members of the class, thereby making final injunctive relief or declaratory relief concerning the class as a whole appropriate."

Here, the Plaintiff's claims are not limited to its own individual relationship with LM Funding.  The Plaintiff also claims that it is LM Funding's policy and common practice to charge members of the putative class amounts in excess of that permitted under Florida law. The Plaintiff claims that this policy violates FDUTPA, Florida and Federal RICO, as well as the statutory provisions governing usury that were enacted for the benefit for all consumers. Therefore, the Plaintiff alleges that Defendant's actions in violation of FDUTPA, RICO, and the usury legislation are directed at the public at large, and not to any particular individual. The claims Plaintiff seeks to bring as a class action focus on the common actions of LM Funding, rather than on the individual factual claims of each putative class member.

By adopting a policy and practice of charging for and collecting sums they are specifically prohibited from attempting to collect, LM Funding has clearly acted in a consistent manner with regard to the entire putative class. Furthermore, at least for those class members who owe (or will owe) LM Funding more than they have yet paid, the declaratory relief requested is not merely incidental to a damage claim.

26

Rather, the opposite is true. Declaratory relief is a paramount remedy sought to be exercised on behalf of the class. A judgment for damages is only required to the extent that the Court grants the declaratory relief sought by Plaintiffs.  The Court finds that the injunctive relief sought through this action predominates over the monetary damages.

**ORDERED AND ADJUDGED** that the Plaintiff's Motion is **GRANTED**.

1.   The Court appoints Solaris at Brickell Bay Condominium Association, Inc. as class representative;

2.   The Court appoints John G. Crabtree and Crabtree & Auslander; Brian M. Torres and Brian M. Torres, P.A.; Jose Baloyra and Baloyra Law; John Cody German and Cole, Scott, & Kissane, P.A.; and Milton Fuentes and M. Fuentes & Co. as class counsel. Lead trial counsel shall be designated at a later date.

3.    The class period is defined as the period from April 15, 2011, through the entry of judgment herein.

4.   The Court certifies the following class:

All Florida homeowners' and condominium associations that entered Class Member Agreements with LM Funding since LM Funding was founded on January 14, 2008, provided (a) that LM Funding has billed or received money pursuant to the contract within the four-year period immediately preceding April 15, 2015; and (b) Business Law Group engaged in collection activity, or otherwise served as counsel for the association.

For purposes of class certification, "Class Member Agreement" is defined as a contract under which:

a) LM Funding advanced a sum of money to the association that did not exceed the safe-harbor amount that the association was statutorily entitled to under Florida Statute Subsection 718.116(1)(b) (for condominium associations) or Florida Statutes Subsection 720.3085(2)(c) (for homeowner associations);

b) In return for advancing that sum, LM Funding received the power to collect all the outstanding, delinquent assessments owed by a portfolio of the association's delinquent units and also to retain all interest and late fees that had accrued (and continued to accrue) on that portfolio;

c) Pursuant to a waterfall-type repayment structure, any money collected by LM Funding is to be credited against a hierarchy of repayment categories—each of which must be satisfied before proceeds may be credited against the next subordinate tier;

d) The waterfall repayment structure dictates that LM Funding will retain from any future collections all interest, late fees owed to the associations, and the initial cash advance before the association is entitled to recover any delinquent funds; and

e) LM Funding is explicitly authorized to engage Business Law Group to act on behalf of the association.

5. Plaintiff's claims in this action may be maintained under Florida Rule of Civil Procedure 1.220(b)(3) and 1.220(b)(2).

6. Notice shall be provided to all potential class members of the pendency of this claim in conformity with Florida Rule of Civil Procedure 1.220(d)(2).

DONE AND ORDERED in Chambers at Miami-Dade County, Florida, on 12/05/16.

JOHN W. THORNTON
CIRCUIT COURT JUDGE

**No Further Judicial Action Required on <u>THIS</u>**
**<u>MOTION</u>**
**CLERK TO <u>RECLOSE</u> CASE <u>IF</u> POST**
**JUDGMENT**

The parties served with this Order are indicated in the accompanying 11th Circuit email confirmation which includes all emails provided by the submitter.  The movant shall IMMEDIATELY serve a true and correct copy of this Order, by mail, facsimile, email or hand-delivery, to all parties/counsel of record for whom service is not indicated by the accompanying 11th Circuit confirmation, and file proof of service with the Clerk of Court.

Signed and stamped original Order sent to court file by Judge Thornton's staff.

<u>Copies to:</u>
Jesse Lee Ray, Esq. - jray@jesseleeray.com
Elizabeth Fernandez, Esq. - efernandez@jesseleeray.com
Jose L. Baloyra, Esq. - jbaloyra@baloyralaw.com; rcruz@baloyralaw.com
Milton Fuentes, Esq. - mf@mfuenteslaw.com; sc@mfuenteslaw.com
Brian M. Torres, Esq. - btorres@sheftalltorres.com;
mrodriguez@sheftalltorres.com
John G. Crabtree, Esq. - jcrabtree@crabtreelaw.com
George R. Baise Jr., Esq. - gbaise@crabtreelaw.com
Brian C. Tackenberg, Esq. - btackenberg@crabtreelaw.com
John Cody German, Esq. - cody.german@csklegal.com

29